# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| REPUBLIC BANK,<br><br>        Plaintiff,<br><br>vs.<br><br>ETHOS ENVIRONMENTAL, INC.,<br><br>        Defendant. | Case No. 1:09 cv 24 BCW<br><br>**ORDER AND MEMORANDUM DECISION GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Magistrate Judge Brooke C. Wells |

Plaintiff, Republic Bank, Inc. moves for summary judgment in favor on all its claims against Defendant Ethos Environmental, Inc. and dismissal of all of Ethos' counterclaims. Republic argues there is no genuine issue as to any material fact. At oral argument Glen Bronson represented Plaintiff and Joe Covey and John Snow appeared on behalf of Defendant. Having heard oral argument and after considering the parties' memoranda, affidavits and relevant case law the court renders the following decision. As outlined below, the court grants the motion.

## I. BACKGROUND[1]

In February 2007, Ethos entered into a sale and lease-back agreement whereby Ethos sold "its heavy, bolted-down industrial operating equipment (the "Equipment") to Mazuma who then

---

[1] The court finds the following facts to be undisputed.

simultaneously 'leased' the exact same Equipment back to Ethos."[2] The Equipment never moved from Ethos' factory and is still located there as of the date of this decision. Mazuma paid Ethos $737,967 for the equipment.

On approximately April 10, 2007, Mazuma sold and assigned to Plaintiff Republic all its right, title and interest in the Lease and the Property. In the agreement Mazuma was designated Republic's agent to, *inter alia*, enforce all available rights and remedies under the Lease. Republic paid Mazuma $882,684.87 for the Lease agreement and the Property. Ethos consented to Mazuma's assignment of the Lease to Republic and executed a letter agreement memorializing its consent. The letter agreement states, "Lessee, [Ethos] by signature below, acknowledges notice of the foregoing sale and assignment, and agrees that the Lease is in full force and effect and Lessee is not in default thereunder . . . and the Lessee will not modify or consent to any modification of the terms of the Lease."[3] Thomas Maher, Ethos' Chief Financial Officer at the time, signed the consent assignment agreement on April 12, 2007. Prior to this agreement, Republic had no right, title or interest in the Property.

The Lease provides that Ethos is to make monthly rental payments, which are due on the first of the month, in the amount of $30,441.16 plus applicable sale/use tax to the Lessor for the use of the Property during the term of the Lease.[4] The Lease further states that the base period is

---

[2] Op. p. ii.
[3] Letter agreement p. 1, attached as ex. C to Carpenter Aff.
[4] Amendment No. 1 to the Lease Schedule, Ex. A to the Carpenter Affidavit.

for twenty-four (24) months[5] and that Ethos is in default if it fails to pay monthly rent when due and such failure to pay continues for ten (10) days after the due date.[6]

On April 18, 2007, or approximately one week after Mazuma sold to Republic it right, title, and interest in the Lease and Property, Mazuma sent Republic written notice that it intended to repurchase the Lease. The repurchase was to take place at "any time during, or at the end of the Assigned Rental Payments period as defined in the Sale Agreement."[7]

During the first week of September 2008, Mr. Maher, Ethos' CFO, contacted Doug Petty, who was the head of Mazuma's credit department, and asked for a Lease payoff amount as of October 1, 2008, and as of the end of the Lease term on May 1, 2009.[8] Mr. Petty referred Mr. Maher to Matthew Burrows, who was head of Mazuma's marketing department. On approximately September 19, 2008, Mr. Burrows asked Mr. Maher to put Ethos' payoff request in writing. After Mr. Maher did so, he repeatedly contacted Mr. Burrows to get the payoff amount. Eventually, Mr. Burrows sent an email to Nancy Eggan, the Executive Vice President over Operations for Mazuma, asking her to contact Republic to get a payoff amount because Ethos was "hounding [Mr. Burrows] for an early payoff number."[9]

---

[5] Ex. A to the Carpenter Affidavit Lease Schedule.
[6] *Id.* at Lease, § 19(a).
[7] Notice to Repurchase, Ex. B to Maher Affidavit.
[8] Maher Affidavit ¶ 20.
[9] Ex. E to the Maher Affidavit.

Ethos asserts that in early October 2008, Mr. Burrows "finally responded to Mr. Maher and verbally told him that the payoff amount under the lease was $797,000."[10] Republic disputes this assertion in its briefing. But, during oral argument, Republic withdrew its dispute with the amount for purposes of its motion. Regardless of any alleged oral offers, on December 24, 2008, Mr. Burrows sent an email to Ethos outlining in detail an early payoff amount. The email states

> This email is in response to your request for an updated payoff. As we discussed on the phone Monday afternoon, the Ethos Environmental, Inc. Lease has been in and out of Default multiple times over the past 18 months due to material breaches of our documents. Now, Ethos is seriously past due for the December rental. In this circumstance, our documents clearly state that Mazuma is entitled to 18 continuation payments. In an attempt to settle this matter amicably, and to hopefully mend the relationship, our committee has backed off of your contractual obligation by nearly $100,000.[11]

The total payoff amount set forth in the email is $657,000, which is $140,000 less than the earlier payoff amount of $797,000 that was verbally communicated.

Mr. Maher admitted to receiving the December 24th email. And, after receiving the alleged verbal payoff amount in early October he "ceased my frequent phone calling and faxing because [he obtained the information he had been seeking]."[12] There is nothing in the record indicating a response by Ethos to the email sent on December 24th.

---

[10] Maher Affidavit ¶ 23.
[11] Email from Matthew Burrows, attached as Ex. A to Burrows Affidavit.
[12] Second Affidavit of Thomas Maher p. 3.

## II. DISCUSSION

Republic moves for summary judgment on the following claims made against Ethos: (1) breach of the lease agreement, (2) breach of release, and (3) repossession of equipment. Republic also moves for summary judgment on Ethos' counterclaims and affirmative defenses. Ethos raises, *inter alia*, the following counterclaims and defenses: (1) the Lease is a security agreement rather than a true lease and (2) breach of the covenant of good faith and fair dealing, and (3) that the lease is unconscionable. The court addresses these issues in turn below.

### A. LEGAL STANDARD

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[13] The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[14] "The mere existence of a scintilla of evidence in support of [a party's] position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [respective party]."[15]

---

[13] Fed.R.Civ.P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Alder v. Wal-Mart Sotres, Inc., 144 F.3d 664, 670 (10th Cir. 1998).
[14] *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).
[15] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Anderson v. Coors Brewing Co., 181 F.3d 1171, 1175 (10th Cir. 1999) ("A mere scintilla of evidence supporting the nonmoving party's theory does not create

Defendant asserts that "'summary judgment is a drastic remedy which is to be granted with caution so as to insure that litigants will have a trial on bona fide factual disputes.'"[16] Clearly, there is a preference to have a trial on factual disputes, but the United States Supreme Court has stated that, "The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"[17] Thus, summary judgment is appropriate in this matter if there are no genuine triable issues of material fact.

Finally, the court notes that the moving party, which is Republic in this motion, "has the initial burden of demonstrating the absence of any genuine issue of material fact to support the non-moving party's case."[18] Once the moving party has met this burden, the burden then shifts back to the nonmoving party to show that there is a genuine issue of material fact.[19] To discharge its burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"[20] If the non-moving party fails to meet this burden with respect to any essential element of its case on which it bears the burden of

---

a genuine issue of material fact.").
[16] Op. p. 14 (quoting *Barber v. Gen. Elec. Co.*, 648 F.2d 1272, 1276 N. 1 (10th Cir. 1981)).
[17] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).
[18] *Jensen v. Kimble*, 1 F.3d 1073, 1076 (10th Cir. 1993) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).
[19] *See Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).
[20] *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

proof at trial, then the moving party is entitled to summary judgment because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[21] The court considers the "evidence in the light most favorable to the non-moving party, drawing all reasonable inferences from the available underlying facts."[22]

**B. THE LEASE**

At the heart of this dispute is a section of the lease agreement entered into by Ethos and Mazuma. The parties refer to the contested section as 21(k) and it states in relevant part:

> <u>Lessee's Options at Maturity of Base Period</u>. At the maturity of the Base Period of any Lease, Lessee shall, provided at least one-hundred-twenty (120) days prior written notice is received by Lessor from Lessee via certified mail, do one of the following: (1) purchase the Property for a price to be determined by Lessor and Lessee, (2) continue the Lease for twelve (12) months at the rate specified on the respective Schedule, or (3) terminate the Schedule and return the Property to the Lessor at Lessee's expense . . .; provided, however, that for option (3) to apply, all accrued but unpaid late charges, interest, taxes, penalties, and any and all other sums due and owing under the Schedule must first be paid in full, . . . , and Lessee must enter into a new Schedule with Lessor to lease Property that replaces the Property listed on the old Schedule. With respect to options (1) and (3), each party shall have the right in its absolute and sole discretion to accept or reject any terms of purchase or of any new Schedule, as applicable. In the event Lessor and Lessee have not agreed to either option (1) or (3) by the maturity of the Base Period, or if Lessee fails to give written notice of its option via certified mail at least one-hundred-twenty (120) days prior to the maturity of the Base Period, or if an Event of Default has occurred under any Lease, then option (2) shall apply at the maturity of the Base Period. At the maturity of the continued period provided for in option (2) above, the Lease shall continue in effect at the rate specified in the respective Schedule for successive periods of six (6) months each subject to termination at the maturity of any such successive six-month continuation period by either Lessor or Lessee giving the other party at least thirty (30) days prior written notice of termination.[23]

---

[21] *Id.* at 323.
[22] *Jaramillo v. Colo. Judicial Dep't.*, 427 F.3d 1303, 1307 (10th Cir. 2005) (*en banc*) (*per curiam*) (quotation marks omitted).
[23] Lease agreement § 21(k). Attached as exhibit A to the affidavit of Mark J. Carpenter.

7

Also of note, is another part of the Lease agreement where the parties executed another document entitled "'Schedule B Stipulated Loss Schedule Dated February 07, 2007.'"[24] "The Stipulated Loss Schedule set the depreciating value of the Equipment, after 18 monthly payments at $400,972.00 and after 24 payments at $290,000."[25]

**C. ISSUES**

At the outset, the court notes that based upon Ethos' opposition to Republic's motion, and as represented during oral argument on the motion, Ethos no longer alleges that the "Lease Agreement is a security agreement or installment sales contract."[26] Additionally, Ethos "does not contend, . . . , that the 'hell or high water' or 'waiver of defense' provisions are themselves unconscionable or unenforceable."[27] Accordingly, the court does not address these uncontested issues.

Based upon the evidence presently before the court, the court finds that Republic has met the "initial burden of demonstrating the absence of any genuine issue of material fact to support the non-moving party's case."[28] Therefore, the court now looks to whether or not Ethos raises a genuine issue of material fact.[29] Ethos' argues issues of material fact exist as to the following:

---

[24] Op. p. iii. For a copy of the Stipulated Loss Schedule see exhibit F to the Affidavit of Thomas Maher.
[25] *Id.* at iii-iv.
[26] Answer and Counterclaim p. 4.
[27] Ethos' contention that these provisions do not preclude Ethos from raising its unconscionability defense with respect to a Section 21(k) of the Lease is addressed by the court infra.
[28] *Jensen*, 1 F.3d at 1076 (citation omitted).
[29] *See Bacchus*, 939 F.2d at 891.

8

(1) whether Republic acted in good faith and (2) whether Republic has standing to sue under the Lease. Ethos further alleges that Republic's motion should be denied because Section 21(K) of the Lease is unconscionable. Before turning to these issues, however, the court notes that the parties exert much effort in arguing when exactly a default occurred under the terms of the Lease. The court finds it sufficient to state that based upon the undisputed facts Ethos was in default by the time it received an email detailing the payoff amount from Matthew Burrows, head of Mazuma's marketing department, on December 24, 2008. The exact timing of default is unnecessary to the court's decision.

   1. *The Covenant of Good Faith and Fair Dealing*

As noted by Ethos, the elements of a prima facie case for breach of contract are: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of contract by the other party, and (4) damages."[30] Under Utah law—which governs the contract in this dispute—is "an implied covenant of good faith and fair dealing generally inheres in all contractual relationships."[31] Pursuant to this implied covenant of good faith and fair dealing "the contracting parties each impliedly promise not to intentionally or purposely do anything that will destroy or injure the other party's right to receive the fruits of the contract."[32] Yet, "the covenant of good faith and fair dealing cannot be construed to establish new, independent rights or duties

---

[30] *Blair v. Axiom Design, L.L.C.*, 2001 UT 20, ¶ 14, 20 P.3d 388.
[31] *Prince v. Bear River mutual Ins. Co.*, 2002 UT 68, ¶ 27, 56 P.3d 534, 533.
[32] *Id.* at ¶ 27.

not agreed upon by the parties."[33]

Ethos argues the evidence shows that "Mazuma/Republic (1) refused to provide a good faith buyback amount for the Equipment when the Lease should have been terminated and (2) conspired together from the beginning of the Lease and planned to intentionally provide an unreasonable buyback amount in order to force Ethos into an unwanted extension of the Lease."[34]

### *(i)     The Payoff or Buyback Amount*

In early September 2008, Ethos asked Mazuma to provide it with a payoff or buyback amount. Eventually, after the request was submitted in writing and after some "hounding," Ethos provided a payoff amount verbally over the phone of $797,000. According to Ethos, this "amount was $150,000 higher than: (1) the sum of Ethos's remaining six rental payments ($183,646.96) and (2) the fair market value of the Equipment at the end of the Lease according to Republic's expert ($440,000)."[35]

Initially, the parties contested this alleged verbal payoff amount. Republic, however, withdrew its contention for purposes of this motion during oral argument. The court, therefore, does not consider this $797,000 payoff figure to be in dispute. During oral argument, Republic also noted that an email outlining the payoff amount in detail was sent to Ethos from Matthew Burrows, head of Mazuma's marketing department, on December 24, 2008. The total payoff

---

[33] *Andalex Resources, Inc. v. Myers*, 871 P.2d 1041, 1048 (Utah App. 1994).
[34] Op. p. 3.
[35] *Id.* at p. 4.

amount set forth in the email is $657,000. There is nothing in the record indicating a response by Ethos to the email sent on December 24th.

In reviewing these undisputed facts, the court finds they undermine Ethos' position. The payoff amount sent via email, $657,000, is relatively close to the amount Ethos asserts would be fair in its opposition ($623,646.96). In the court's view, a difference of approximately $33,353.04 is difficult to construe as an offer in bad faith. Perhaps, if Mazuma had persisted in the verbal offer that was much higher than later amount sent via email, or if Mazuma had completely refused to negotiate at all by not sending any payoff amount, then there would be more evidence of bad faith. But, based on the undisputed facts, such is not the case here.[36]

*(ii)    The Alleged Mazuma/Republic Conspiracy*

Next, Ethos asserts that "Mazuma/Republic had planned to make such an unreasonable [payoff] offer all along, counting on Ethos to be unwilling or unable to pay it, thus being enabled to unilaterally extend the Lease at the end of the 24-month term by virtue of the Lease's provision regarding automatic extension upon failure of the parties to agree upon a buyback amount."[37] In support of this position, Ethos points to the assignment agreement between Mazuma and Republic. "Republic paid Mazuma $882,684.87, which was $152,097.00 more than what constituted the full value of the original 24-month payment stream under the Lease."[38]

---

[36] *See House of Flavors, Inc. v. TFG-Michigan, L.P.*, 674 F.Supp.2d 306, 311-12 (D.Me 2009) (applying Utah's implied terms of good faith and fair dealing to a contract and concluding that the party did not breach the covenant of good faith and fair dealing because it was involved in negotiating a purchase price).
[37] Op. p. 5.
[38] *Id.* at p. 6.

Thus, Republic's willingness to pay more than the 24-month payment stream is evidence that Mazuma/Republic had planned all along to force Ethos into extending the Lease.

In opposition, Republic notes that Mazuma paid Ethos $737,967.62 for the Equipment at issue and leased it back to Ethos for $30,441.16 per month for the base period of 24 months. Total rent payments during the 24-month base period, had Ethos completed the payments, would have been $730,587.84, which is $7,379.78 less than what Mazuma paid Ethos for the Property. Therefore, Republic argues, at least some value in the Lease was found in the options at the end of the 24-month payment stream.

The court agrees with Republic. It is hard to imagine any lender, especially a sophisticated one, entering into a transaction that on its face would lose money. Certainly, such a lender would not be in business for any significant amount of time. The undisputed facts here demonstrate that there is some value in the options that are found at the end of the 24-month base period. The fact that Republic paid more than what Ethos may have for these options, does not per se, demonstrate bad faith.

At oral argument, Ethos argued that in "looking at everything in the totality" there are disputed issues which demonstrate "a concern over whether or not Republic acted in good faith."[39] The court disagrees and finds that Ethos has failed to set forth any material facts that are at issue in regard to whether or not Republic and/or Mazuma breached the covenant of good faith and fair dealing. Therefore, the court will grant Republic's motion on Ethos' breach of the

---

[39] Tr. 45 (transcript of oral argument on Plaintiff's motion held before the court).

covenant of good faith and fair dealing counterclaim.

   *2. Republic's Standing to Sue Under the Lease*

Ethos argues that "A genuine issue of fact that precludes summary judgment . . . exists concerning whether Republic is even the true party in interest that is able to sue Ethos under the Lease."[40] Ethos alleges that Mazuma—not Republic—may be the true owner of the leased equipment based upon Mazuma's notice on April 18, 2007, that it intended to repurchase the Lease and related property.

The court has considered the written notice provided by Mazuma to Republic and the facts surrounding it found in the record including the supplemental affidavit of Mark Carpenter, the Senior Vice President of Republic Bank. It is clear that Mazuma acted on behalf of Republic as its agent pursuant to their assignment agreement. And, although Mazuma notified Republic of its intent to repurchase the Lease, there is nothing before the court indicating that Mazuma actually repurchased the Lease. The written notice Mazuma gave Republic provided that the repurchase could take place at the end of the agreement. And, Mr. Carpenter has testified that Mazuma has not repurchased the Lease or Property from Republic.[41]

The relationship between Ethos and Republic was severely strained by the end of 2008. But, by all accounts, the agreement between Ethos and Republic was not at its end. In reviewing the record, the court finds that a reasonable jury could not return a verdict in favor of Ethos on

---

[40] Op. p. 6.
[41] *See* Supplemental Affidavit of Mark J. Carpenter p. 2.

this issue. Thus, there is no genuine issue of material fact concerning Republic's standing to sue under the Lease.[42] Therefore, the court will grant Republic's motion as to its standing to sue under the lease.

### 3. *Section 21(K) of the Lease*

Ethos asserts that its unconscionability defense is not barred by the "Hell or High Water" and "waiver of defense" provisions. "Ethos' unconscionability defense goes to the validity of the Lease itself, specifically Section 21(k)."[43] And where "'a contractual provision is found to be unconscionable, the provision is void and unenforceable.'"[44]

Ethos next asserts that Republic is subject to its unconscionability defense through Republic's agent, Mazuma. And finally, Ethos alleges its unconscionability defense is not waived because "an issue of fact remains concerning whether Republic took the assigned Lease in good faith."[45]

In contrast, and as one would expect, Republic argues at length in its memorandum that the hell or high water and waiver of defense provisions are enforceable and preclude Ethos from raising its unconscionability defense.

The court finds it does not need to address whether or not the hell or high water and waiver of defense provisions preclude Ethos from raising its unconscionability defense, because

---

[42] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).
[43] Op. p. 8.
[44] *Id.* (citing *Knight Adjustment Bureau v. Lewis*, 2010 Utah App. Lexis 38 (Utah Ct. App. February 19, 2010) (unpublished).
[45] *Id.* at p. 9.

in any event, this defense fails as a matter of law

Utah courts have recognized that the defense of unconscionability is available under the common law. Utah courts have "long held that unconscionable provisions of contracts are unenforceable."[46] "The determination of whether a contract is unconscionable is usually made with respect to the conditions that existed at the time the contract was made, and without regard for the parties' subsequent conduct and dealings."[47] Further, "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction."[48]

Substantive unconscionability may also support a finding of unconscionability.[49] "Substantive unconscionability is indicated by 'contract terms so one-sided as to oppress or unfairly surprise an innocent party,' . . . an overall imbalance in the obligations and rights imposed by the bargain."[50]

Here, Ethos argues Section 21(k) of the Lease is "one-sided, oppressive, and imbalanced-and thus unconscionable-because it allows the lessor to assert that Ethos has a perpetual obligation on Ethos to endlessly renew the Lease, never allowing Ethos to terminate the

---

[46] *Bekins Bar V Ranch v. Huth*, 664 P.2d 455, 461 (Utah 1983) (citations omitted).
[47] *Id.*
[48] *Id.* at 461-62.
[49] *See Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1988).
[50] *Resource Management Co. v. Weston Ranch and Livestock Co., Inc.*, 706 P.2d 1028, 1041 (Utah 1985) (internal citation omitted).

Lease."[51] A careful reading of the Lease undermines Ethos' position.

The Lease provides:

> <u>Lessee's Options at Maturity of Base Period</u>. At the maturity of the Base Period of any Lease, Lessee shall, provided at least one-hundred-twenty (120) days prior written notice is received by Lessor from Lessee via certified mail, do one of the following: (1) purchase the Property for a price to be determined by Lessor and Lessee, (2) continue the Lease for twelve (12) months at the rate specified on the respective Schedule, or (3) terminate the Schedule and return the Property to the Lessor at Lessee's expense . . .; provided, however, that for option (3) to apply, all accrued but unpaid late charges, interest, taxes, penalties, and any and all other sums due and owing under the Schedule must first be paid in full, . . . , and Lessee must enter into a new Schedule with Lessor to lease Property that replaces the Property listed on the old Schedule. With respect to options (1) and (3), each party shall have the right in its absolute and sole discretion to accept or reject any terms of purchase or of any new Schedule, as applicable. In the event Lessor and Lessee have not agreed to either option (1) or (3) by the maturity of the Base Period, or if Lessee fails to give written notice of its option via certified mail at least one-hundred-twenty (120) days prior to the maturity of the Base Period, or if an Event of Default has occurred under any Lease, then option (2) shall apply at the maturity of the Base Period. At the maturity of the continued period provided for in option (2) above, the Lease shall continue in effect at the rate specified in the respective Schedule for successive periods of six (6) months each subject to termination at the maturity of any such successive six-month continuation period by either Lessor or Lessee giving the other party at least thirty (30) days prior written notice of termination.[52]

Ethos notes that the Lease gives three options at the end of the 24-month period: (1) purchase the Property at a "price to be determined by Lessor and Lessee," (2) continue the Lease for twelve months, or (3) terminate the Lease. But, according to Ethos, in order to exercise option 3 and terminate the Lease, Ethos must enter into another lease. And, if the parties cannot agree on a purchase price for the property then option 2 automatically renews the Lease for an

---

[51] Op. p. 12.
[52] Lease agreement § 21(k). Attached as exhibit A to the affidavit of Mark J. Carpenter.

16

additional 12 months.

Ethos, however, conveniently ignores the last part of the agreement which sets forth the termination of the lease upon 30 days prior written notice of termination. Thus, if option 2 applies, the Lease is extended for "twelve (12) months at the rate specified." Then, "At the maturity of the continued period provided for in option (2) above, the Lease shall continue in effect at the rate specified in the respective Schedule for successive periods of six (6) months each subject to termination at the maturity of any such successive six-month continuation period by either Lessor or Lessee." Therefore, if a default occurred, or if the parties could not agree on a buyback price, the Lease would continue for 18 months. But, contrary to Ethos' representation, Section 21(k) does not provide that the same three options continually apply at the end of the 12 month period. Instead, there is an option to terminate the lease at the end of an additional six months following this initial 12 month period.

Ethos asserts that Section 21(k) of the Lease is like part of the clause found in *Andin Int'l Inc. v. Matrix Funding Corp.*[53] In *Andin*, the court surmised that even if it were to apply Utah law, the clause contained in the financing lease "in all likelihood"[54] would be unenforceable because it created a perpetual obligation and thus was unconscionable. The provision in *Andin* states:

> *Lessee's Options at end of Initial Period.* At the end of the Initial Period of any Lease, or upon any expiration of any renewal or extension thereof as provided for in option (2)

---

[53] 756 N.Y.S.2d 724 (N.Y. Sup. Ct. 2003).
[54] *Id.* at 727.

17

herein or otherwise, Lessee shall, provided at least one hundred eighty (180) days prior written notice is received by Lessor from Lessee via certified mail, do one of the following: (1) purchase the Property for a mutually agreeable price, (2) extend the Lease for twelve (12) additional months at the rate specified on the respective Schedule, or (3) return the Property to Lessor at Lessee's expense to a destination with the continental United States specified by Lessor and terminate the Schedule; provided, however, that for option (3) to apply ... Lessee must enter into a new Schedule with Lessor to lease Property which replaces the Property listed on the old Schedule. With respect to options (1) and (3), each party shall have the right in its absolute and sole discretion to accept or reject any terms of purchase or of any new Schedule, as applicable. In the event Lessor and Lessee have not agreed to either option (1) or (3) by the end of the Initial Period or any renewal or extension period then in effect, or if Lessee fails to give written notice of its option via certified mail at least one hundred eighty (180) days prior to the termination of the Initial Period or any renewal or extension period then in effect, then option (2) shall apply at the end of the Initial Period or any renewal or extension period then in effect.[55]

While this clause is very close to Section 21(k) in this case, there is a significant difference in that the clause in *Andin* is missing the last part of Section 21(k) wherein "successive periods of six (6) months [are] each subject to termination at the maturity of any such successive six-month continuation period by either Lessor or Lessee." Thus, the court finds the clause in this case is materially different than that found in *Andin*.

Finally, based upon the plain language found in Section 21(k),[56] the court finds Section 21(k) is not so one-sided, oppressive, and imbalanced that it is unconscionable. As outlined above, Section 21(k) does not create a perpetual obligation to renew the Lease. Accordingly, the court rejects Ethos' argument that Section 21(k) is unconscionable and therefore, summary

---

[55] *Id.* at 726.
[56] Ethos further argues that Section 21(k) is at least ambiguous and therefore requires parol evidence to ascertain the parties' intent, which precludes summary judgment. As a matter of law, the court finds Section 21(k) is not ambiguous based upon the plain language found in the document.

judgment should be precluded.

### III. CONCLUSION

It is therefore

ORDERED that Plaintiff Republic Bank's Motion for Summary Judgment[57] is GRANTED. It is further

ORDERED that Republic Bank's Motion for Scheduling Order[58] is DENIED as MOOT.

The Clerk of Court is directed to enter judgment in favor of Plaintiff. The case, however, is to remain open until such time as Defendant's Motion to Withdraw is decided.[59]

DATED this 9th day of February, 2011.

_____
Brooke C. Wells
United States Magistrate Judge

---

[57] Docket no. 20.
[58] Docket no. 66.
[59] Docket no. 67. Defendant's Motion to Withdraw was filed on January 24, 2011.